# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

━━━━━━━━━━━━━━━

№ 14-CV-6782 (JFB)

━━━━━━━━━━━━━━━

FRANCIS P. CLARK,

Plaintiff,

VERSUS

CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY,

Defendant.

━━━━━━━━━━━━━━━

**MEMORANDUM AND ORDER**
March 31, 2016

━━━━━━━━━━━━━━━

JOSEPH F. BIANCO, District Judge:

Plaintiff Francis Clark ("plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("SSA"), challenging the final decision of the defendant, the Commissioner of Social Security ("defendant" or the "Commissioner"), denying plaintiff's application for disability insurance benefits. An Administrative Law Judge ("ALJ") found that plaintiff had the residual capacity to perform sedentary work as defined by 20 C.F.R. § 404.1567(a), with certain limitations, and that although he was unable to perform any past relevant work, there were a number of jobs in the national economy that he could perform. Therefore, the ALJ determined that plaintiff was not disabled, and thus, was not entitled to benefits. The Appeals Council denied plaintiff's request for review.

For the reasons set forth herein, the Court denies the Commissioner's motion for judgment on the pleadings, denies plaintiff's cross-motion for judgment on the pleadings, and grants plaintiff's motion to remand. Accordingly, the case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order. Remand is warranted because the ALJ clearly failed to properly weigh the opinion of the treating physician, Dr. Schweitzer.

I.   BACKGROUND

A.   Factual Background

The following summary of the relevant facts is based upon the Administrative Record ("AR") developed by the ALJ. A more exhaustive recitation of the facts is contained in the parties' submissions to the Court and is not repeated herein.

1. Personal and Work History

Plaintiff was born in 1968, and was 42 years old at the time of the alleged disability onset date, February 9, 2011. (AR at 43, 68.) He is a college graduate. (*Id.* at 43.) Plaintiff testified that he started work as a police sergeant in 1998. (*Id.* at 68.) He has also worked part-time as a landscaper mowing lawns. (*Id.* at 45.) Plaintiff sustained a shoulder injury in November 2009 (*id.* at 46), after which he performed only light duty police work (*id.* at 72). As a result of his shoulder injury, plaintiff had to stop working in 2011 (*id.* at 46, 69), though he attempted to return to work as a landscaper in June and July of 2012 (*id.* at 44-45).

2. Medical History

On May 31, 1988, plaintiff underwent corrective surgery for a left anterior recurrent shoulder dislocation. (*Id.* at 311.)

On October 6, 2008, while apprehending a suspect, plaintiff was thrown to the ground and injured his left shoulder. (*Id.* at 306.) He was diagnosed with left shoulder acromioclavicular joint separation. (*Id.*)

On October 14, October 21, and November 4, 2008, plaintiff was seen by Dr. Jack Schweitzer, an orthopedic surgeon, who confirmed the acromioclavicular joint separation diagnosis. (*Id.* at 306-07.) On November 4, 2008, a magnetic resonance imaging ("MRI") of plaintiff's left shoulder was performed. (*Id.* at 318.) Results provided to Dr. Schweitzer showed a tear of the posterior glenoid labrum, degenerative osteoarthritis of the glenohumeral joint associated with joint effusion, and mild degenerative hypotrophic changes of the acromiclavicular joint. (*Id.*) Dr. Schweitzer reviewed these results with plaintiff on November 11, 2008, and recommended that plaintiff perform physical therapy. (*Id.* at 307.)

In November 2009, plaintiff fell, injuring his knee and aggravating his shoulder injury. (*Id.* at 321.) Plaintiff visited Dr. James Kipnis on November 9, 2009. (*Id.*) Dr. Kipnis noted that "[e]xaminaton of the left shoulder demonstrates pain with forward flexion to 90 degrees" and "[t]orn labrum left shoulder[,] [d]egenerative joint disease left shoulder." (*Id.* at 322.) Dr. Kipnis ordered an MRI of plaintiff's left shoulder. (*Id.*) The MRI, performed on November 12, 2009, showed mild to moderate impingement of the acromial tip, no rotator cuff tear, and mild to moderate degenerative arthritis. (*Id.* at 323.) On November 16, 2009, Dr. Kipnis diagnosed sprains and strains of the left shoulder with superior glenoid labrum tear. (*Id.* at 319.)

On November 27, 2009, Dr. David Tuckman examined plaintiff's left shoulder. (*Id.* at 325.) Dr. Tuckman informed plaintiff that there was nothing he could do about plaintiff's arthritis. (*Id.* at 325-26.) However, Dr. Tuckman recommended arthroscopic surgery to stabilize the shoulder. (*Id.*)

On January 6, 2010, Dr. Tuckman performed left shoulder arthroscopy and Bankart repair. (*Id.* at 324.)

On October 4, 2010, Dr. Arsen Pankovich of the Medical Board Police Pension Fund, found decreased range of motion of plaintiff's left shoulder with clicking and grinding during testing. (*Id.* at 309.) Dr. Pankovich also found decreased muscle strength and atrophy of plaintiff's left shoulder. (*Id.*) However, peripheral pulses were normal and equal. (*Id.*) There was normal range of motion of plaintiff's elbow, wrist, joints, and hand. (*Id.*) Plaintiff

2

reported to Dr. Pankovich that his pain was a 5 on a scale of 1 to 10. (*Id.* at 308.) Dr. Pankovich recommended accident disability retirement. (*Id.* at 309.)

On November 19, 2010, Dr. Salvatore Lenzo evaluated plaintiff for complaints of numbness and tingling in his left hand, and ordered electrodiagnostic studies. (*Id.* at 330.) The electromyography was consistent with left ulnar neuropathy at the left elbow. (*Id.* at 305.) Nerve conduction studies showed slow ulnar nerve conduction across the left elbow and active denervation in ulnar innervated left hand and forearm muscles. (*Id.*)

On January 28, 2011, plaintiff returned to Dr. Lenzo for a follow-up appointment, complaining of increasing numbness, tingling, and weakness in the left hand and ulna nerve distribution. (*Id.* at 329.) Dr. Lenzo noted that "[t]he patient has failed conservative management" and recommended ulnar nerve surgery. (*Id.*)

Between January and November 2011, Dr. James Fitzgibbon, a chiropractor, provided plaintiff with chiropractic treatments. (*Id.* at 301-03.)

On February 16, 2011, plaintiff underwent surgery for compression of the left ulnar nerve and medial epicondylitis of the left elbow. (*Id.* at 258-59, 327-28.)

The record reflects that Dr. Lenzo prescribed plaintiff Hydrocodone, a narcotic pain medication.[1] (*Id.* at 197.)

In a report for the New York State Office of Temporary and Disability Assistance dated May 27, 2011 (*id.* at 260-66), Dr. Fitzgibbon reported that plaintiff received chiropractic treatments twice a week for neck pain radiating into his left shoulder and arm (*id.* at 260). Dr. Fitzgibbon opined that plaintiff could lift and carry ten pounds occasionally, stand and walk less than two hours a day, and sit less than two hours a day. (*Id.* at 263.) Dr. Fitzgibbon opined that plaintiff had limited ability to push and pull with his left shoulder. (*Id.* at 264.)

On the same date, Dr. Erlinda Austria performed a consultative orthopedic examination. (*Id.* at 277-82.) Dr. Austria observed that plaintiff walked with a normal gait; could walk on his heels and toes; could squat three-fourths of the way; had normal station; used no assistive device; needed no help changing his clothes or getting on and off the examination table; and was able to rise from the chair without difficulty. (*Id.* at 278.) His hand and finger dexterity were intact, and his grip strength was 5/5 in the right hand and 4/5 in the left hand. (*Id.*) The cervical spine exhibited flexion to 40 degrees, extension to 25 degrees, lateral flexion to 35 degrees, and rotation to 70 degrees. (*Id.*) There was no cervical or paracervical pain or spasm. (*Id.*) There was limitation of motion of plaintiff's elbows and wrists. (*Id.* at 279.) Strength in the upper and lower extremities was 5/5 on the right side and 4/5 on the left side. (*Id.*) There was no joint inflammation, effusion, or instability in the upper extremities. (*Id.*) There was no muscle atrophy or sensory abnormality in the upper extremities. (*Id.*) Reflexes were physiologic and equal. (*Id.*) Plaintiff's range of motion of his lumbar spine was restricted. (*Id.*) There was no spinal, paraspinal, sacroiliac, or sciatic notch tenderness. (*Id.*) There was no spasm, scoliosis, or kyphosis of the spine. (*Id.*) Straight leg raising was 70 degrees bilaterally from the supine position. (*Id.*) Straight leg raising was 90 degrees bilaterally from the

---

[1] The record does not reflect when Dr. Lenzo prescribed this medication.

3

sitting position. (*Id.*) There was limitation of motion of the hips and knees. (*Id.*) There was full range of motion of the ankles bilaterally. (*Id.*) X-rays of the cervical spine showed straightening. (*Id.* at 279, 282.) X-rays of the lumbosacral spine showed degenerative changes. (*Id.* at 279, 281.) Dr. Austria opined that plaintiff had mild restriction to activities of the head and neck; mild to moderate restrictions to activities involving the left shoulder with limited range of motion; moderate restriction to activities involving the left elbow; and mild to moderate restriction to squatting, bending, prolonged sitting, standing, and walking. (*Id.* at 280.)

On September 12, 2011, Dr. Schweitzer evaluated plaintiff for left shoulder pain. (*Id.* at 286.) Dr. Schweitzer diagnosed status-post left shoulder injury with a torn labrum and acromioclavicular separation. (*Id.* at 287.) Neurometric findings indicated hypoesthesia in the left upper extremity in particular. (*Id.*) Dr. Schweitzer found abduction limited to 90 degrees in the left shoulder and forward flexion to 90 to 100 degrees. (*Id.*) He also found that motor strength of the upper left extremity was limited to 4/5. (*Id.*)

On September 19, 2011, Dr. Schweitzer found instability of the left shoulder girdle. (*Id.* at 290.) Dr. Schweitzer prescribed physical therapy consisting of TENS, ultrasound, and hot packs to the left shoulder girdle. (*Id.*) The record of the visit indicates that plaintiff informed Dr. Schweitzer that he had the feeling that his left shoulder was going in and out of place and that he had continued to experience pain in his shoulder joint following his surgery. (*Id.*)

On October 3 and October 17, 2011, Dr. Schweitzer again prescribed physical therapy. (*Id.* at 292-94, 295-97.)

On November 7, 2011, Dr. Schweitzer found atrophy of the left upper extremity and continued to prescribe physical therapy. (*Id.* at 298-30.)

In a medical assessment dated November 7, 2011, Dr. Schweitzer opined that plaintiff could lift and carry five pounds occasionally. (*Id.* at 283.) Dr. Schweitzer opined that plaintiff could occasionally grasp, handle and hold objects, finger, pick, pinch, and type, but could never reach, push, pull, or twist/turn objects with his left upper extremity. (*Id.* at 284.) Dr. Schweitzer noted that plaintiff suffered from anterior instability in the left shoulder girdle, reduced grip strength, loss of coordination, loss of sensation, severe arthritis, and atrophy of the entire upper left extremity. (*Id.* at 283.) He also noted that "patient functions entirely with his right upper extremity." (*Id.* at 284.)

On April 4, 2012, plaintiff sought treatment from Dr. Eric Keefer for complaints of left shoulder, arm, and elbow pain, which he described as "sharp." (*Id.* at 369.) Plaintiff reported pain of 10 on a scale of 0 to 10 when active, and 6 when resting. (*Id.*) He described the severity of the pain as a 10 on a scale of 0 to 10. (*Id.*) He reported that the pain affected his ability to sleep and that the pain was worse while stretching, lifting, exercise, and coughing. (*Id.*) He also reported that the pain caused depression, irritability, and mood swings. (*Id.*) Dr. Keefer observed forward flexion of the shoulder was limited to 150 degrees, instability testing was positive for apprehension and relocation signs, and cuff testing produced pain. (*Id.*) Dr. Keefer administered an injection of Depomedrol. (*Id.*)

Plaintiff visited Dr. Keefer again on May 16, 2012. (*Id.* at 367.) Plaintiff reported pain of 8 on a scale of 0 to 10 when active, and 6

4

when resting. (*Id.*) He described the severity of the pain as a 6 on a scale of 0 to 10. (*Id.*) The treatment notes also indicate that plaintiff was taking Nucynta, a narcotic pain medication. (*Id.*)

Plaintiff returned to Dr. Keefer on August 15, 2012. (*Id.* at 365.) Plaintiff reported pain of 7 on a scale of 0 to 10 when active, and 3 when resting. (*Id.*) He described the severity of the pain as a 5 on a scale of 0 to 10. (*Id.*) Plaintiff demonstrated limited range of motion in his left shoulder. (*Id.*)

On September 26, 2012, plaintiff attended a follow-up appointment with Dr. Keefer. (*Id.* at 363.) Plaintiff again reported pain of 7 on a scale of 0 to 10 when active, and 3 when resting. (*Id.*) He described the severity of the pain as a 5 on a scale of 0 to 10. (*Id.*) An examination revealed instability and limited range of motion in the left shoulder. (*Id.*) Dr. Keefer prescribed a home exercise program and directed plaintiff to ice the affected areas. (*Id.*)

Plaintiff returned to Dr. Keefer on February 13, 2013. (*Id.* at 361.) During the visit, Dr. Keefer noted limited range of motion in plaintiff's left shoulder, and that plaintiff complained of continued shoulder pain. (*Id.*) Dr. Keefer also administered an Orthovisc injection into plaintiff's left shoulder. (*Id.*)

At plaintiff's next visit with Dr. Keefer on February 20, 2013, plaintiff reported "continued left shoulder pain," and Dr. Keefer noted limited range of motion in plaintiff's left shoulder. (*Id.* at 357-58.) Plaintiff informed Dr. Keefer that the Orthovisc injection had helped "about 50 percent," and plaintiff received a second Orthovisc injection during this visit. (*Id.*)

At his appointment on February 27, 2013, plaintiff again reported shoulder pain, and Dr. Keefer again noted limited range of motion in plaintiff's left shoulder. (*Id.* at 355-56.) Plaintiff informed Dr. Keefer that the prior injection helped "about 70 percent" with the pain, and Dr. Keefer administered a third Orthovisc injection. (*Id.* at 354-55.)

On March 6, 2013, at his appointment, plaintiff again reported shoulder pain and received a fourth Orthovisc injection. (*Id.* at 352-53.) He informed Dr. Keefer that the prior injection had helped "60 percent" with the pain. (*Id.* at 351.) The treatment report also notes that plaintiff had tried "aspirin, Ibuprofen, aleve, etc. or prescription NSAIDS, and/or exercises at home and/ or physical therapy without satisfactory response." (*Id.* at 352-53.)

On March 20, 2013, plaintiff visited Dr. Mitchell Goldstein and complained of pain in his left shoulder that radiated down his back, restricted range of motion with his left shoulder, pain in his left elbow, and numbness in his pinky finger. (*Id.* at 348.) Plaintiff described the pain as "shooting, stabbing" and stated that the pain was a 10 on a scale of 0 to 10 when active and 6 when at rest. (*Id.*) Plaintiff described the severity of the pain as a 10 on a scale of 0 to 10. (*Id.*) The treatment notes indicate that plaintiff had been prescribed Nucynta since May 2012 and that he had difficulty with activities of daily living and driving. (*Id.*) Dr. Goldstein also prescribed Nucynta, use of a heating pad, and TENS. (*Id.* at 350.)

Dr. Goldstein referred plaintiff for an MRI of the lumbar spine, which was performed on March 29, 2013. (*Id.* at 372.) The MRI revealed L1-L2 and L3-L4 posterior disc bulges with no stenosis, and L5-S1 broad based central disc herniation impinging on the thecal sac and adjacent left descending nerve root with facet arthropathy.

(*Id.*) An MRI of plaintiff's cervical spine performed on March 30, 2013 showed small right posteriolateral herniation at C3-4, a small central posteriolateral herniation at C4-5 and C5-6, and mild disc bulging at C7-T1. (*Id.* at 371.)

Plaintiff returned to Dr. Goldstein on April 17, 2013. (*Id.* at 345.) Plaintiff reported pain of 8 on a scale of 0 to 10 when active, and 3 when resting. (*Id.*) He described the severity of the pain as a 4 on a scale of 0 to 10. (*Id.*)

Plaintiff saw Dr. Goldstein again on June 12, 2013. (*Id.* at 342.) He reported that he was experiencing worsening pain in his shoulder, as well as elbow, neck, and lower back pain, and numbness in his hand. (*Id.*) Treatment notes reveal that he was taking Nucynta as needed for pain and that a TENS unit was helping with pain. (*Id.*) Plaintiff reported pain of 10 on a scale of 0 to 10 when active, and 5 when resting. (*Id.*) He described the severity of the pain as an 8 on a scale of 0 to 10 and described his pain as "sharp and stabbing." (*Id.*)

At his August 13, 2013 appointment with Dr. Goldstein, plaintiff reported that his lower back, neck, and left shoulder remained symptomatic. (*Id.* at 339.) He also stated that he was using Nucynta and receiving chiropractic care. (*Id.*) Plaintiff reported pain of 9 on a scale of 0 to 10 when active, and 5 when resting. (*Id.*) He described the severity of the pain as a 5 on a scale of 0 to 10. (*Id.*) Dr. Goldstein noted a limited range of motion with plaintiff's left shoulder. (*Id.* at 340.)

In a functional assessment dated August 23, 2013, Dr. Goldstein opined that plaintiff could stand and/or walk for less than two hours and sit for less than six hours in an eight-hour day, lift and carry between five and ten pounds for one-third of the day, and lift and carry less than five pounds for two-thirds of the day. (*Id.* at 332.) Dr. Goldstein checked off items on a list indicating: plaintiff required periods of bed rest and frequent breaks during the day; pain prevented him from performing eight hours of work; plaintiff took medication that interfered with his ability to function; plaintiff had difficulty concentrating and required two or more sick days a month; and plaintiff had environmental limitations. (*Id.* at 333.)

In a report dated September 25, 2013, Dr. Goldstein reported that he evaluated plaintiff on March 20, April 17, June 12, August 13, and September 25, 2013. (*Id.* at 335-38.) Dr. Goldstein diagnosed lumbago, lumbar radiculopathy, lumbar sprain, cervical radiculopathy, trigger point with neck pain, shoulder pain/osteoarthritis, ulnar nerve injury, and lumbar and cervical herniated nucleus pulposus. (*Id.* at 337.) Dr. Goldstein opined that plaintiff was permanently and totally disabled. (*Id.* at 338.)

In a functional assessment dated October 14, 2013, Dr. Michael Hearns opined that plaintiff could stand and/or walk for less than two hours and sit for less than six hours in an eight-hour day, lift and carry between five and ten pounds for one-third of the day to two-thirds of the day. (*Id.* at 378.) Dr. Hearns checked off items on a list indicating: plaintiff required periods of bed rest and frequent breaks during the day, pain prevented him from performing eight hours of work; plaintiff took medication that interfered with his ability to function; plaintiff had difficulty concentrating and required two or more sick days a month. (*Id.* at 379.)

In a report dated October 15, 2013, Dr. Hearns reported that a physical examination

revealed that plaintiff walked without a cane. (*Id.* at 382.) Plaintiff's neck and lower back exhibited multiple trigger points and muscle spasms. (*Id.* at 382-83.) There was limited range of motion of the left shoulder. (*Id.* at 383.) There were blunted deep tendon reflexes in the left ankle and in both arms, and weakness of the left foot and arm. (*Id.*) Dr. Hearns diagnosed status-post two left shoulder surgeries, status-post left elbow surgery, cervical and lumbar herniated discs and radiculopathy, and left arm cubical tunnel syndrome. Dr. Hearns opined that plaintiff was "unfit to perform any competitive job within the US job market." (*Id.*)

Dr. Osvaldo Fulco, a board certified internist, testified as a medical expert at plaintiff's second hearing. (*Id.* at 51-54.) Dr. Fulco opined that, based on his review of the medical evidence, plaintiff had significant limitations in the use of his left upper extremity for gross and fine manipulations. (*Id.* at 53.) Dr. Fulco opined that plaintiff could lift up to ten pounds, sit for six hours, and stand and walk for up to two hours in an eight-hour day, but should not push or pull. (*Id.*)

B. Procedural History

Plaintiff protectively filed an application for disability insurance benefits on April 14, 2011, alleging disability since February 9, 2011 due to neck, back and left arm conditions. (*Id.* at 175-76, 195.) On June 16, 2011, plaintiff's application was denied (*id.* at 80, 101-08), and he thereafter requested a hearing (*id.* at 109-10). Plaintiff's hearing was held on December 14, 2011, before the ALJ. (*Id.* at 65-79.) Plaintiff appeared with counsel. (*Id.* at 65.) On January 5, 2012, the ALJ found that plaintiff was not disabled (*id.* at 81-93), and, on March 8, 2012, the SSA received plaintiff's request for the Appeals Council to review the ALJ's decision (*id.* at 136-40). By Order dated May 7, 2013, the Appeals Council vacated the hearing decision and remanded the case to the ALJ for further administrative proceedings. (*Id.* at 94-98.) A supplemental hearing was held before the ALJ on October 22, 2013. (*Id.* at 40-64.) Plaintiff appeared with counsel, and a medical and a vocational expert testified. (*Id.* at 40-41.) The ALJ issued a decision on November 22, 2013, which concluded that plaintiff was not disabled. (*Id.* at 24-35.) This decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on September 22, 2014. (*Id.* at 1-6.)

II. STANDARD OF REVIEW

A district court may set aside a determination by an ALJ "only where it is based upon legal error or is not supported by substantial evidence." *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)). The Supreme Court has defined "substantial evidence" in Social Security cases to mean "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted); *see Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013). Furthermore, "it is up to the agency, and not th[e] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (internal citation and quotation marks omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d

7

Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner.").

### III. DISCUSSION

#### A. The Disability Determination

A claimant is entitled to disability benefits if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the SSA unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with respect to the first four steps; the Commissioner bears the burden of proving the last step. *Id.*

The Commissioner "must consider" the following in determining a claimant's entitlement to benefits: "'(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience.'" *Id.* (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

8

### B. Analysis

According to plaintiff, the ALJ erred in failing to properly weigh the medical evidence, in failing to properly evaluate plaintiff's credibility, and in identifying other work plaintiff could perform. As set forth below, the Court agrees that the ALJ erred by failing to adequately explain the reasons for determining that the opinion of plaintiff's treating physician, Dr. Schweitzer, should not be afforded controlling weight, and remands on this basis.

#### 1. The ALJ's Decision

##### a. Substantial Gainful Activity

At step one, the ALJ must determine whether the claimant is presently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(b). "Substantial work activity is work activity that involves doing significant physical or mental activities," *id.* § 404.1572(a), and gainful work activity is work usually done for pay or profit, *id.* § 404.1572(b). Individuals who are employed are engaging in substantial gainful activity.

Here, the ALJ determined that plaintiff had not engaged in substantial gainful activity since the alleged onset date of February 9, 2011. (AR at 29.) Substantial evidence supports this finding, and plaintiff does not challenge its correctness.

##### b. Severe Impairment

At step two, if the claimant is not employed, the ALJ determines whether the claimant has a "severe impairment" that limits his capacity to work. An impairment or combination of impairments is "severe" if it significantly limits an individual's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c); *see also Perez*, 77 F.3d at 46.

Here, the ALJ found that plaintiff had the following severe impairments: left shoulder internal derangement status-post arthroscopic repair, left ulnar neuropathy status-post transposition, cervical and lumbar degenerative disc disease. (AR. at 30.) Substantial evidence supports this finding, and plaintiff does not challenge its correctness.

##### c. Listed Impairments

At step three, if the claimant has a severe impairment, the ALJ next considers whether the claimant has an impairment that is listed within 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1") of the regulations. When the claimant has such an impairment, the ALJ will find the claimant disabled without considering the claimant's age, education, or work experience. 20 C.F.R. § 404.1520(d).

Here, the ALJ found that none of plaintiff's impairments, alone or in combination, met or medically equaled the severity of one of the listed impairments in Appendix 1. (AR at 30.) Substantial evidence supports this finding, and plaintiff does not challenge its correctness.

##### d. Residual Function Capacity and Past Relevant Work

If the severe impairments do not meet or equal a listed impairment, the ALJ assesses the claimant's residual function capacity "based on all the relevant medical and other evidence in [the] case record." 20 C.F.R. § 404.1520(e). The ALJ then determines at step four whether, based on the claimant's residual function capacity ("RFC"), the claimant can perform her past relevant work. *Id.* § 404.1520(f). When the claimant can

9

perform her past relevant work, the ALJ will find that she is not disabled. (*Id.*)

In this case, the ALJ found that plaintiff had the "residual functional capacity to perform sedentary work as defined by 20 CFR § 404.1567(a) except sit for six hours and stand/walk two hours in an eight-hour workday and lift/carry ten pounds and perform only occasional reaching, handling and fingering with the left non-dominate upper extremity." (AR at 30.) Assisted by the testimony of a vocational expert, the ALJ concluded that plaintiff could not perform any past relevant work. (*Id.* at 34.)

The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms. (*Id.*) However, the ALJ concluded that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (*Id.*)

The ALJ concluded that "only some weight" should be given to the opinion of Dr. Schweitzer because his conclusions concerning plaintiff's lift/carry limitations and his determination that plaintiff could "never reach push/pull, turn or twist objects with the left upper extremity" were inconsistent with the conservative treatment plaintiff received. (*Id.* at 32.) The ALJ afforded significant weight to Dr. Austria's opinion, noting that it was "consistent with the clinical signs displayed during the examination, which include[d] limitations in range of motion of the shoulder and that [plaintiff] was three months status-post left elbow surgery." (*Id.*) The ALJ also assigned "great weight" to Dr. Fulco's opinion, as it was "consistent with the nature of [plaintiff's] most significant impairment, left shoulder internal derangement" and because "[plaintiff] has full use of his right dominate upper extremity and performs a wide range of activities of daily living." (*Id.* at 33-34.)

Plaintiff challenges the ALJ's assessment of his residual functional capacity. For the reasons set forth *infra*, the Court finds that there were legal errors in connection with the ALJ's assessment of plaintiff's residual functional capacity. Specifically, the ALJ, in determining that "only some weight" can be given to Dr. Schweitzer's opinion, failed to evaluate the various factors that must be considered when determining how much weight to give to the treating physician's opinion. Because of this error, remand is necessary because the Court cannot determine whether substantial evidence supports the ALJ's decision. *See Noutsis v. Colvin*, No. 14-CV-5294 (JFB), 2016 WL 552585, at *7 (E.D.N.Y. Feb. 10, 2016); *Branca v. Comm'r of Soc. Sec.*, No. 12-CV-643 (JFB), 2013 WL 5274310, at *11 (E.D.N.Y. Sept. 18, 2013).

e. Other Work

At step five, if the claimant is unable to perform her past relevant work, the ALJ determines whether the claimant is capable of adjusting to performing any other work. 20 C.F.R. § 404.1520(g). To support a finding that an individual is not disabled, the Commissioner has the burden of demonstrating that other jobs exist in significant numbers in the national economy that claimant can perform. *Id.* § 404.1560(c); *see, e.g.*, *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).

The ALJ noted that where the claimant has the residual functional capacity to perform the full range of sedentary work, the ALJ is permitted to rely on the Medical-Vocational Guidelines, *see* 20 C.F.R. Part 404, Subpart P, Appendix 2, to determine whether a claimant is disabled. (*See* AR at

35.) However, here, because plaintiff was unable to perform the full range of sedentary work, the Guidelines were not controlling, and the ALJ called upon a vocational expert to testify regarding occupational opportunities available to plaintiff, given his exertional limitations. (*Id.*) Given plaintiff's age, work experience, education, and residual functional capacity, the vocational expert testified that plaintiff would be able to perform the requirements of representative occupations such as Call Out Operator (an unskilled job with 16,000 positions nationwide), Information Clerk (a semi-skilled job with 600,000 positions nationwide), or Insurance Clerk (a semi-skilled job with 130,000 positions nationwide). (*Id.*) Accordingly, the ALJ concluded that based on the testimony of the vocational expert and plaintiff's age, education, work experience, and residual functional capacity, plaintiff was capable of making a successful adjustment to other work in the national economy and, therefore, a finding of "not disabled" was appropriate. (*Id.*)

2. Treating Physician Rule

Plaintiff argues, among other things, that the ALJ failed to credit the testimony of his treating orthopedist, Dr. Schweitzer. The Court agrees that the ALJ failed to apply the proper standard for evaluating the medical opinion of Dr. Schweitzer, and remands the case on this basis.

a. Legal Standard

The Commissioner must give special evidentiary weight to the opinion of a treating physician. *See Clark*, 143 F.3d at 118. The "treating physician rule," as it is known, "mandates that the medical opinion of a claimant's treating physician [be] given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see, e.g.*, *Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999); *Clark*, 143 F.3d at 118. The rule, as set forth in the regulations, provides:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2).

Although treating physicians may share their opinion concerning a patient's inability to work and the severity of the disability, the ultimate decision of whether an individual is disabled is "reserved to the Commissioner." *Id.* § 404.1527(d)(1); *see also Snell v. Apfel*,

177 F.3d 128, 133 (2d Cir. 1999) ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.").

When the Commissioner decides that the opinion of a treating physician should not be given controlling weight, she must "give good reasons in [the] notice of determination or decision for the weight [she] gives [the claimant's] treating source's opinion." 20 C.F.R. § 404.1527(c)(2); *see Perez v. Astrue*, No. 07-CV-958 (DLJ), 2009 WL 2496585, at *8 (E.D.N.Y. Aug. 14, 2009) ("Even if [the treating physician's] opinions do not merit controlling weight, the ALJ must explain what weight she gave those opinions and must articulate good reasons for not crediting the opinions of a claimant's treating physician."); *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 627 (S.D.N.Y. 2006) ("Even if the treating physician's opinion is contradicted by substantial evidence and is thus not controlling, it is still entitled to significant weight because the treating source is inherently more familiar with a claimant's medical condition than are other sources." (internal citation and quotation marks omitted)). Specifically, "[a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). "Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is ground for a remand." *Snell*, 177 F.3d at 133.

b. Analysis

The Court finds that the ALJ failed to apply the proper standard for evaluating the opinion of Dr. Schweitzer, plaintiff's treating physician. The ALJ concluded that "only some weight" should be given to Dr. Schweitzer's opinion because his conclusions concerning plaintiff's lift/carry limitations and his determination that plaintiff could "never reach push/pull, turn or twist objects with the left upper extremity" were inconsistent with the conservative treatment plaintiff received.[2] (AR at 32.) However, this summary conclusion does not set forth in sufficient detail the reasons for affording only "some weight" to the treating physician's opinion. The ALJ did not address the several factors required to be considered when an ALJ affords a treating source less than controlling weight, despite the Second Circuit's repeated admonitions to do so. *Shaw*, 221 F.3d at 134; *see also Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 & n.2 (2d Cir. 2010) ("Before an

---

[2] Although the ALJ's prior decision, rendered on January 5, 2012, refers to Dr. Schweitzer as plaintiff's treating physician (*see* AR at 88), the ALJ did not refer to Dr. Schweitzer as such in the decision under review herein. The Commissioner does not dispute in her opposition that Dr. Schweitzer is a treating physician.

Separately, the Court notes that, curiously, the ALJ's decision rendered on January 5, 2012 concluded that "[d]ue to the fact that Dr. Scweitzer's (sic) serves as the claimant's treating physician and found restrictions primarily involving the left upper extremity, which are supported by objective medical findings, the undersigned finds that his opinion is also entitled to substantial weight (20 C.F.R. § 404.1527)." (*Id.*)

ALJ may elect to discredit the medical conclusions of a treating physician, she must explicitly consider the factors specified in the regulation. . . . [T]he [treating physician] rule imposes on the Commissioner a heightened duty of explanation when a treating physician's medical opinion is discredited." (internal quotation marks omitted)); *Taylor v. Barnhart*, 117 F. App'x 139, 140-41 (2d Cir. 2004) (remanding case because ALJ "did not give sufficient reasons explaining how, and on the basis of what factors, [the treating physician's] opinion was weighed," and stating that "we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion" (internal citation and quotation marks omitted)); *Torres v. Comm'r of Soc. Sec.*, No. 13-CV-330 (JFB), 2014 WL 69869, at *13 (E.D.N.Y. Jan. 9, 2014) (finding error where ALJ assigned only "some weight" to opinion of treating physician); *Black v. Barnhart*, No. 01-CV-7825(FB), 2002 WL 1934052, at *4 (E.D.N.Y. Aug. 22, 2002) ("[T]he treating physician rule required the ALJ . . . to clearly articulate her reasons for assigning weights.").

For example, the ALJ failed to explain his rejection of Dr. Schweitzer's opinion in reference to Dr. Schweitzer's status as an orthopedic specialist.[3] *See, e.g.*, *Veresan v. Astrue*, No. 06 Civ. 5195(JG), 2007 WL 1876499, at *5 (E.D.N.Y. June 29, 2007) (remanding case, in part, because ALJ did not indicate what weight, if any, was assigned based on the fact that medical opinions were from specialists); *see also Serrano v. Colvin*, No. 12 CIV. 7485 PGG JLC, 2014 WL 197677, at *17 (S.D.N.Y. Jan. 17, 2014) (failure to consider how treating physician's specialization "might impact the value of [his] opinions" warranted remand); *Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 507-508 (S.D.N.Y. 2014) (holding that ALJ erred in failing to "explicitly consider" whether the treating physician was a specialist in its decision to override the treating physician's opinion). This omission is especially significant in light of the fact that the ALJ gave "great weight" to the opinion of consultative physician, Dr. Fulco, who was merely an internist, not an orthopedic specialist, and who never examined plaintiff.[4] *See, e.g.*, *Santos v. Astrue*, No. 12 CIV. 2075 JGK, 2013 WL 5462337, at *7 (S.D.N.Y. Sept. 30, 2013) (explaining that, all things being equal, a treating physician's opinion should be credited over a conflicting consultative physician's opinion, especially where the treating physician is a specialist in the relevant field and the consultative physician

---

[3] The ALJ indicated only that Dr. Schweitzer was a "pain management specialist," but failed to note that Dr. Schweitzer was also an orthopedic specialist. (*See* AR at 284.)

[4] Relying on Dr. Fulco's testimony, the ALJ concluded that plaintiff could perform reaching, handling, and fingering "occasionally" (AR at 30), which in the Social Security context, means "up to" one-third of the work day, *see* SSR 83-10. Dr. Schweitzer, however, concluded that plaintiff could *never* reach, push/pull, turn or twist objects with the left upper extremity. (*Id.* at 32.) Plaintiff asserts that Dr. Schweitzer's limitations are appropriate and, further, that they are actually consistent with Dr. Fulco's conclusion because Dr. Fulco opined that plaintiff could perform these activities for *less than* one-third of the workday. Thus, plaintiff appears to argue that the opinions of Drs. Fulco and Schweitzer are consistent with each other and inconsistent with the ALJ's determination because both doctors limited plaintiff's activity to *less than* one-third of the work day, whereas the ALJ's limit was *up to* one third of the work day. Plaintiff's attempt to distinguish "*up to* one-third" from "*less than* one-third" appears to the Court to be nothing more than semantics. (Furthermore, SSR 83-10 states that "occasionally" means "occurring from very little up to one-third of the time.") In any event, because the Court is already remanding this case, it need not, and does not, address this argument.

is not). Nor does it appear that the ALJ even took into account the entire duration of Dr. Schweitzer's treatment of plaintiff, much less explain how this factor weighed in his analysis. (The ALJ stated that Dr. Schweitzer saw plaintiff between September and November 2011 (*see* AR at 32); however, the record reflects that Dr. Schweitzer saw plaintiff as early as 2008 for his shoulder injury (*see id.* at 307, 382).) Accordingly, the case must be remanded to the ALJ for further consideration of Dr. Schweitzer's opinion in light of this Court's analysis.[5] *See, e.g.*, *Rolon*, 994 F. Supp. 2d at 506, 508 (noting of plaintiff's subjective testimony concerning his pain and was inconsistent with the ALJ's conclusion that plaintiff's pain was less severe than claimed), *report and recommendation adopted*, No. 09 CIV. 6363 RJS MHD, 2011 WL 649665 (S.D.N.Y. Feb. 17, 2011); *Longerman v. Astrue*, No. 11 CV 383, 2011 WL 5190319, at *14 (N.D. Ill. Oct. 28, 2011) (ALJ's failure to consider the numerous narcotic medications taken by plaintiff warranted remand); *see also Jaeckel v. Colvin*, No. 13-CV-4270 SJF, 2015 WL 5316335, at *11 (E.D.N.Y. Sept. 11, 2015) (remand was appropriate where it was "not clear that the ALJ took into account the factors listed in 20 C.F.R. § 404.1529(c)(3) other than plaintiff's daily activities"). Thus, after conducting the proper treating physician analysis, the ALJ also shall re-assess plaintiff's credibility, including consideration of any prescribed narcotic pain medication used by plaintiff.

Additionally, plaintiff contends that the ALJ erred at step five in concluding that jobs existed in sufficient number in the national economy that plaintiff could perform. More specifically, plaintiff contends that it was error for the ALJ to include in his calculus two positions identified by the vocational expert that were semi-skilled, despite the fact that the ALJ did not make an explicit finding concerning the transferability of skills, concluding instead that transferability was "not material to the determination of disability." (AR at 34.) The Court need not decide this issue at this juncture in light of the decision to remand based on the ALJ's contravention of the treating physician rule; nevertheless, the Court notes that there are cases from outside this Circuit that support plaintiff's position that, in order for the ALJ to consider semi-skilled positions at step five, he must first find that the plaintiff has transferable skills that will enable him to perform more than unskilled work. *See, e.g.*, *Steward v. Barnhart*, 44 F. App'x 151, 152 (9th Cir. 2002) ("[A]n applicant must possess transferable skills from previous work in order to perform [semi-skilled] jobs."); *Phair v. Colvin*, No. 3:12-CV-06073-RBL, 2013 WL 6185243, at *3 (W.D. Wash. Nov. 26, 2013) (concluding that without a finding on the transferability of skills, the court was unable to determine "whether or not the ALJ properly found

---

[5] Plaintiff also contends that the ALJ erred in concluding that plaintiff's statements regarding "the intensity, persistence and limiting effects of [his] symptoms [were] not entirely credible." Specifically, plaintiff argues that the ALJ failed to take into account the fact that plaintiff's pain was severe enough that he was prescribed narcotic pain medication. In conducting the credibility inquiry, the ALJ must consider seven factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. 20 C.F.R. § 404.1529(c)(3)(i)-(vii). An ALJ is not always required to give exhaustive explanations for every one of these factors in his written decision, *see Delk v. Astrue*, No. 07-CV-167-JTC, 2009 WL 656319, at *4 (W.D.N.Y. Mar. 11, 2009), but he must state his reasons "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for [his] disbelief," *Young v. Astrue*, No. 7:05-CV-1027, 2008 WL 4518992, at *11 (N.D.N.Y. Sept. 30, 2008) (quoting *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y. 1987)). Here, despite the express requirement to consider "the type, dosage, effectiveness, and side effects of any medications taken [by plaintiff] to alleviate the pain," it does not appear that the ALJ considered the fact that plaintiff was prescribed narcotic medications, Hydrocodone and Nucynta, to treat his pain. The Court notes that other similar cases have held that it was error to fail to consider the plaintiff's use of narcotic pain medication as part of the credibility analysis. *See, e.g.*, *Sanchez v. Colvin*, No. 13-CV-929 MKB, 2014 WL 4065091, at *14-15 (E.D.N.Y. Aug. 14, 2014) (remanding where ALJ failed to consider all of the factors required by § 404.1529(c)(3), including the plaintiff's use of narcotic pain medication); *Archambault v. Astrue*, No. 09 CIV. 6363 RJS MHD, 2010 WL 5829378, at *33-34 (S.D.N.Y. Dec. 13, 2010) (holding that plaintiff's use of narcotic pain medication supported credibility

that "[f]ailure to properly apply the treating physician's rule, or consider the required factors, constitutes legal error and is a sufficient basis for remand" and remanding where ALJ failed to explicitly consider physician's specialty and the frequency, length, nature, and extent of treatment).

Furthermore, the ALJ's only stated basis for discounting Dr. Schweitzer's opinion is an impermissible one. The ALJ faulted Dr. Schweitzer's opinion because he found that it was inconsistent with the conservative treatment received by plaintiff. (AR at 32.) However, the Second Circuit has instructed that the ALJ cannot use the plaintiff's prescribed conservative treatment as the "substantial evidence" to limit the weight afforded to the opinion of a treating physician. *See, e.g.*, *Foxman v. Barnhart*, 157 F. App'x 344, 347 (2d Cir. 2005) ("[T]he ALJ erred in questioning the validity of [the treating physician's] opinion based on his 'conservative' course of treatment." (citing *Shaw*, 221 F.3d at 134 (ruling that "the district court improperly characterized the fact that [the treating physician] recommended only conservative [treatment] as substantial evidence that plaintiff was not physically disabled during the relevant period"))); *see also Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) ("Nor is the opinion of the treating physician to be discounted merely because he has recommended a conservative treatment regimen."); *Ganoe v. Comm'r of Soc. Sec.*, No. 514CV1396GTSWBC, 2015 WL 9267442, at *4 (N.D.N.Y. Nov. 23, 2015) ("[A]lthough the ALJ may rely on conservative treatment in his overall analysis of a treating source's medical opinion, the ALJ may not use Plaintiff's conservation

---

plaintiff could perform [semi-skilled] jobs given his acquired work skills, and thus whether or not the ALJ's step five determination is supported by substantial evidence in the record"); *Teeter v. Comm'r of Soc. Sec.*, No. 1:11 CV 2376, 2012 WL 6772099, at *4 (N.D. Ohio Dec. 12, 2012) (holding that "before [plaintiff] could be found not disabled on the basis of a capacity to perform specified semi-skilled jobs, he needed to first be found to possess transferable skills such as would permit him to perform the identified work"), *report and recommendation adopted*, No. 1:11CV2376, 2013 WL 66086 (N.D. Ohio Jan. 4, 2013); *Macarages v. Astrue*, No. CIV09-1270D, 2010 WL 3749468, at *2-3 (W.D. Okla. Aug. 23, 2010) (recommending reversal based on ALJ's conclusion that the plaintiff could perform semi-skilled positions without finding that the plaintiff possessed transferable skills that would qualify him for a semi-skilled position), *report and recommendation adopted*, No. CIV 09-1270-D, 2010 WL 3749455 (W.D. Okla. Sept. 21, 2010); *Barker v. Astrue*, No. CIV 09-437-P-S, 2010 WL 2680532, at *5 (D. Me. June 29, 2010) ("[T]he administrative law judge indeed erred in deeming the plaintiff capable of performing a semi-skilled job in the absence of a finding that she possessed transferable skills."), *aff'd*, No. CIV. 09-437-P-S, 2010 WL 3082340 (D. Me. Aug. 4, 2010). This analysis is consistent with promulgated Social Security Ruling 83-10, which explains that "[a]bility to perform skilled or semiskilled work depends on the presence of acquired skills which may be transferred to such work from past job experience above the unskilled level," *see* 1983 WL 31251 (1983), and common sense: "[c]learly, plaintiff can not (sic) obtain transferable skills from unskilled work," *Kuleszo v. Barnhart*, 232 F. Supp. 2d 44, 54 (W.D.N.Y. 2002) (citing SSR 00-4p and SSR 82-41).

Notably, however, even if the two semi-skilled positions could not be considered in the ALJ's step five analysis, the vocational expert also identified an unskilled job suitable for plaintiff, of which 16,000 positions exist in the national economy. (AR at 35, 60.) In *Gray v. Colvin*, the court concluded that it could not be said that 16,000 jobs nationally was insignificant as a matter of law. No. 12-CV-6485, 2014 WL 4146880, at *6 (W.D.N.Y. Aug. 19, 2014); *see also Vining v. Secretary of Health & Human Services*, 720 F. Supp. 2d 126, 137 (D. Me. 2010) (concluding that "numbers of jobs in the ballpark of 10,000 to 11,000 nationwide have been held 'significant'"). If the ALJ needs to reach this issue on remand, he should consider whether 16,000 positions is a sufficient number and, if not, whether it is necessary to make a finding that plaintiff had transferable skills allowing him to perform semi-skilled work.

(sic) treatment as proof positive that a treating source's prescribed limitations are unsupported."), *report and recommendation adopted sub nom. Ganoe v. Colvin*, No. 5:14-CV-1396, 2015 WL 9274999 (N.D.N.Y. Dec. 18, 2015); *Valet v. Astrue*, No. 10-CV-3282 KAM, 2012 WL 194970, at *18-19 (E.D.N.Y. Jan. 23, 2012) (holding that it was error to discount treating physician's opinion regarding plaintiff's impairments because it was allegedly inconsistent with the conservative treatment physician had prescribed); *Taylor v. Colvin*, No. 6:12-CV-1326 GTS/VEB, 2014 WL 788842, at *6-7 (N.D.N.Y. Feb. 24, 2014) (same).

Thus, the ALJ's failure to properly consider Dr. Schweitzer's opinion requires remand.

IV. CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied. Plaintiff's cross-motion for judgment on the pleadings is denied, but plaintiff's motion to remand is granted. The case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 31, 2016
      Central Islip, NY

\*\*\*

Plaintiff is represented by Christopher James Bowes, Office of Christopher James Bowes, 54 Cobblestone Drive, Shoreham, NY 11786. The Commissioner is represented by Robert W. Schumacher, II, U.S. Attorney's Office, Eastern District of New York, 610 Federal Plaza, Central Islip, NY 11722.